UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TALESHA VANIQUE MORGAN | * | CIVIL ACTION NO. 22-1085 |
| | * | |
| VERSUS | * | SECTION: "G"(1) |
| | * | |
| KILOLO KIJAKAZI, COMMISSIONER | * | JUDGE NANNETTE JOLIVETTE BROWN |
| OF THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

<u>REPORT AND RECOMMENDATION</u>

The plaintiff, Talesha Vanique Morgan, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. § 423. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 9) be GRANTED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 12) be DENIED. The decision of the Commissioner should be reversed, and benefits should be awarded to Ms. Morgan.

**<u>Procedural Background</u>**

Ms. Morgan applied for DIB on December 15, 2019, asserting a disability onset date of February 6, 2018. She alleged the following illnesses, injuries, or conditions:  multiple sclerosis. On August 24, 2020, her claim was denied by the state agency. The Disability Determination Explanations concluded "[a]lthough you may suffer from multiple sclerosis, the medical evidence shows that you are able to walk, stand and move about independently. You are able to grasp, hold and carry objects that are not too heavy." R. at 78. Ms. Morgan retained counsel and requested reconsideration, which was denied on January 7, 2021.

Ms. Morgan requested a hearing before an Administrative Law Judge ("ALJ"), which was held telephonically on June 9, 2021. On September 15, 2021, the ALJ issued an adverse decision. Ms. Morgan timely appealed to the Appeals Council, which denied review on February 15, 2022.

On April 21, 2022, Ms. Morgan filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 6, 7). The parties filed cross-motions for summary judgment. (Rec. Docs. 9, 12). Ms. Morgan is represented by counsel.

### Evidence in the Record

*1.  Ms. Morgan's Hearing Testimony and Function Reports*

In March 2020, Ms. Morgan completed a Function Report. R. at 223. She stated that she could not stand well or walk without support, that her right hand can only hold things for a short time, that she has pain daily, and that she needs assistance just to go to the bathroom at times. R. at 216. She reported that she can sometimes put clothes in the washing machine, but she needs someone to turn the machine on for her. R. at 218. She cannot cook, but she can make herself a sandwich and feed herself. Id.  She reported that she could not drive because her hands could not hold onto the wheel. R. at 219. She reported that her leg gives out and her balance is off. R. at 220.

Ms. Morgan completed a second Function Report in December 2020. R. at 251. She described her condition and abilities similarly to her March 2020 reports. She noted she can hardly handle anything without dropping it. R. at 247.

At the time of the June 2021 hearing before the ALJ, Ms. Morgan was 44 years old. R. at 33. She testified that she cannot work because she cannot stand for a long period of time. R. at 38. She also cannot hold things with her right hand for a long time—they just fall out of her hand. Id. When asked about her ability to pick up smaller objects like coins or doing buttons, she reported

that she cannot really pick up anything with her right hand. R. at 43. Additionally, she testified that she cannot hold her feces or urine for a long period of time. R. at 38.

Ms. Morgan is on Extavia, a shot that her mother gives her every other day to deal with her multiple sclerosis. R. at 38. The only other medication she takes is Tylenol, for knee pain or to avoid flu-like symptoms from the shot. R. at 38-39, 45. She rated her knee pain as a five on a scale of 1 to 10. R. at 44. She walks with a cane that was prescribed by her doctor. R. at 39. She said she can hardly walk without it. R. at 40. She also has a leg brace that was prescribed by her physical therapist. R. at 39.

Ms. Morgan is able to bathe herself, but she sometimes needs help getting in and out of the bath. R. at 39. She does laundry and sometimes she washes the dishes. R. at 40. She does not perform any yard work. Id.

Ms. Morgan testified that the heaviest weight she can lift is 10 to 15 pounds. Id.  She later clarified that this is the weight she can lift with her left hand; with her right hand she can lift about three pounds. R. at 43. She can sit for about 10 to 15 minutes before needing to stand up and she can stand for about the same amount of time before needing to sit down. R. at 40.

Ms. Morgan reported that she was engaged in self-employment work watching about five kids at her home. R. at 34. She explained that the kids are old enough to go to the bathroom by themselves and she just watches them while their parents go to work or elsewhere. Id.  The children are aged three to five and their parents drop them off with her daily for about three to five hours. R. at 35. She does not cook or clean for them. R. at 34. She is able to warm a meal in the microwave if it is already prepared. R. at 36. Her daughter or a cousin will come daily to help feed the children or assist with other matters, such as getting out clothes to change a child who has made a mess. R.

at 36, 42. Ms. Morgan can change the child, but her daughter or cousin stays in case she needs help. R. at 42.

Ms. Morgan described a typical day as follows: She gets up and washes her face and brushes her teeth. R. at 41. Then she goes downstairs and has breakfast and watches TV until the kids get there. Id.  When the kids arrive she takes care of them. Id.  Her cousin or daughter might come over if she needs a break or needs help. Id.  The kids leave around 5:00 p.m. in the evening. After that, around 6, 7, or 8:00 p.m. she goes upstairs, takes a bath, and gets ready for the next day. Id.

   2.   *Vocational Expert's Testimony and Interrogatory Response*

Vocational expert Deborah Duckett Robichaux testified before the ALJ. R. at 49. She described Ms. Morgan's past work as a child monitor, Dictionary of Occupational Titles ("DOT") number 301.677-010, with SVP of 3. R. at 50. Although the DOT classifies this job at the medium exertion level, based on Ms. Morgan's testimony, the vocational expert concluded that she had performed it at the light level. Id. The vocational expert classified Ms. Morgan's other two past positions as cashier/checker, DOT number 211.462-010, with an SVP of 3 and a light exertion level; and retail salesclerk, DOT number 279.357-054, with an SVP of 3 and a light exertion level. Id.

The ALJ then asked the vocational expert to consider a hypothetical individual with Ms. Morgan's profile, who is a younger individual with at least a 12th grade education, the ability to read and perform basic math, and with the past-relevant work previously described. R. at 51. In the first hypothetical, this person is limited to occasionally and frequently lifting ten pounds; she can sit for six hours in an eight-hour day and stand and walk for two hours of an eight-hour day; she can occasionally climb ramps; she can never climb stairs, ladders, ropes, or scaffolds; with her

right lower extremity she can occasionally operate foot controls; she can occasionally balance, stoop, kneel, crouch, crawl, and bend; she must be allowed to use an assistive device such as a cane at will throughout the work day; she is right hand dominant; with her right upper extremity she is limited to frequent handling, fingering, reaching overhead, and reaching in all other directions; she must avoid unprotected heights, hazardous machinery, open flames, open bodies of water, and rough, uneven, and vibrating surfaces; she must not be required to drive or operate a motor vehicle; and she must avoid concentrated exposure to temperature extremes such as extreme cold. R. at 51-52. The vocational expert testified that she considered the hypothetical to be at the sedentary level and that such a person could not return to Ms. Morgan's past work. R. at 52. However, she testified that there would be other work in the national economy that this person could perform:   addresser, DOT number 209.587-010, sedentary with an SVP of 2 and 12,400 jobs available in the national economy; tube operator, DOT number 239.687-014, sedentary with an SVP of 2, with 7,800 jobs available in the national economy; and surveillance system monitor, DOT number 379.367-010, sedentary with SVP of 2 and 38,500 jobs available in the national economy. R. at 52-53.

Ms. Morgan's attorney questioned the vocational expert about where her numbers for the available jobs came from. R. at 53. The vocational expert testified that she used the Occupational Employment Quarterly, Second Quarter, 2020 ("OEQ"). Id. The OEQ is published by U.S. Publishing, which is not a government agency. Id. The vocational expert clarified in her written submission to the ALJ after the hearing that the OEQ does not provide numbers broken down by DOT number. R. at 306. She explained that to arrive at the numbers broken down by DOT number, she takes the percentages given by Job Browser Pro—a database published by Skilltran. R. at 54, 303. For example, based on the information in the vocational expert's post-hearing submission,

Job Pro shows there are 47,460 jobs under SOC-OES code 43-9022/Census Code 5820, and of these 8.24% or 3911 are associated with the job addresser, DOT 209.587-010. R. at 303. She then takes the total employment provided by OEQ—which is 219,806, and uses the same 8.24% to determine that there are 18,112, addresser jobs. Id. She also modifies the number based on the percentage of jobs that are full time. R. at 54. For example, using OEQ numbers with the Job Pro percentage, there were 18,112 addresser jobs and 69% of them were full time, so she came up with 12,497 full time jobs available for addresser. Id. Ms. Morgan's attorney pointed out that U.S. Publishing uses Census Bureau data that defines full time work as up to 35 hours a week, while Social Security defines full-time work as 40 hours per week. Id. He asked whether the vocational expert had taken this into consideration in calculating the available jobs. Id. She testified that she had not. Id.

The vocational expert acknowledged that the job numbers provided by Job Pro and OEQ differ. R. at 54-56. She could not explain the difference, other than to suggest that OEQ may include jobs that Job Pro does not or that Job Pro looks at the numbers more frequently. R. at 55.

Ms. Morgan's attorney then submitted a report published by the Social Security Administration in May 2011 that lists certain jobs—including addresser and tube operator—as jobs that "might be obsolete." R. at 56, 285. The vocational expert testified that "[o]ne would assume that if it was a job that did not exist in the economy that neither [Job Pro or OEQ] would look at it." R. at 57. She explained that if Job Pro data shows numbers for such jobs, then she is "pretty confident" that there are still some out there based on what she knows "about the company and their research." R. at 57-58. She added that she is "not as confident" in the OEQ numbers because she does not "believe that they do as fine a discovery as they do with Job Browser." R. at 58. She explained how the numbers of surveillance system monitor jobs available has reduced over

time because in the past, the category included jobs that have now been pulled into another, more highly skilled category. Id. She concluded that "one would assume that if the job is still listed in the Dictionary of Occupational Titles and Occupational Quarterly, that they exist in the economy. The numbers may be greatly reduced, but they still exist in some numbers." R. at 58-59.

Ms. Morgan's attorney asked the vocational expert whether, in light of the obsolescence of the addresser and tube operator jobs and the low number of such jobs according to Job Pro, she could identify any other jobs with more than 2,000 or 4,000 positions in the national economy. R. at 56. The vocational expert identified document preparer, DOT 249.587-018, sedentary with an SVP of 2 and 19,000 full time positions according to Job Pro and 12,800 positions according to OEQ. R. at 57. She also identified call-out operator, DOT 237.367-014, sedentary with an SVP of 2, and 2,900 positions according to Job Pro and 6,000 positions according to OEQ. Id.

Ms. Morgan's attorney also asked the vocational expert to consider a hypothetical that modified the right sided fingering and handling limitation to occasionally, instead of frequently. R. at 60. She testified that this would affect the availability of all jobs except the surveillance system monitor. Id. She further testified that if the hypothetical individual was off task for 20% of the workday, the individual would not be able to sustain employment. R. at 63.

In the letter that the vocational expert submitted after the hearing, she listed all five jobs she had discussed at the hearing: addresser, tube operator, surveillance system monitor, call out operator, and document preparer. R. at 303-306. For each, she provided the Job Pro and OEQ numbers. Id. Because the OEQ numbers are not broken down by DOT title, she separately provided for each job her calculation of jobs available for the DOT title using the OEQ numbers and the Job Pro percentages. Id. For example, for the SOC-OES/Census code over the job of tube operator, she noted that Job Pro provided 74,720 total employment, of which 6.086% or 4,574

were associated with the DOT job tube operator, and of those 65% or 2,952 were full time. R. at 304. In contrast, for the SOC-OES/Census code over the job of tube operator, OEQ showed 197,815 total employment; and using the 6.08% from Job Pro, she calculated 12,039 jobs available for the tube operator position and she calculated that 65% of these, or 7,825, were full time. Id.

For the SOC-OES/Census code over the job of surveillance system monitor, she noted that Job Pro provided 79,395 total employment, of which 39.698% or 4,081, were associated with the DOT title for surveillance system monitor, and of those, 73% or 2,979[1] were full time. Id. In contrast, OEQ provided 197,815 total employment. Id. Applying the 39.698% from Job Pro, she calculated that 52,824[2] surveillance system monitor jobs were available and of those 73% or 38,562 were full time. R. at 305.

For the SOC-OES/Census code over the job of call out operator, the vocational expert noted that Job Pro provided 26,700 total employment, of which 11.726% or 3131[3] were associated with the DOT title for call out operator and of those 95% or 2,974 were full time. Id. In contrast, OEQ provided total employment of 54,062. Id. Using the Job Pro percentage of 11.726%, she calculated that 6,338 of these were call out operator jobs and of those 95% or 6,021, were full time. Id.

### 3. Medical Evidence

Ms. Morgan treated with Dr. Richard Friedman at the University Medical Center Neurology Clinic for multiple sclerosis on April 12, 2017. R. at 431. She had no complaints. Id. She reported her right lower extremity was improving in strength and coordination. Id. She had no complaints of side effects from rebif or tizanidine. Id. She was no longer taking baclofen. Id. On

---

[1] The document actually states "29," however, this appears to be a typographical error as 73% of 4,081 is 2,979, not 29. Additionally, at the hearing the vocational expert testified that Job Pro provides for 2,979, surveillance system monitor jobs in the national economy. R. at 55.

[2] On the Court's review, some of the percentage calculations appear to be off by small amounts that may be explained by rounding differences. This calculation, though, is far off. 39.698% of 197,815 is 78,493.

[3] The document actually states "313," however, this appears to be a typographical error as 11.726% of 26,700 is 3131.

a review of symptoms she was negative for psychiatric of behavioral symptoms. R. at 432. She was alert and attentive without deficit. R. at 433.

Ms. Morgan presented to Dr. Shen En Chen at the UMC Neurology Clinic on December 6, 2017. R. at 424. She reported she still had residual weakness in her right upper and lower extremities. Id. She was not taking any baclofen because it makes her sleepy during the day. Id. It was noted that she walks with a cane and that she was working as a cashier at a Family Dollar Store. Id. She reported significant right leg stiffness and weakness. R. at 425. She was negative for psychiatric or behavioral issues on a review of symptoms. Id. She was alert and attentive without deficit. R. at 426.

Ms. Morgan began physical therapy in January 2018. R. at 418. She presented with a history of multiple sclerosis with long standing right side weakness and gait deviations that included right hip circumduction and right foot drag in the swing phase with no knee flexion or dorsiflexion. R. at 422. It was noted that she ambulated with a single point cane but tended to hold on to walls in the physical therapy gym. R. at 419. She denied pain. Id. Her right handed grip and finger strength were assessed at 4/5. R. at 420. She continued with physical therapy until April 2018, and the treatment focused on improving her gait. R. at 404-16.

In April 2018, Ms. Morgan followed up with Dr. Chen. R. at 394. She reported she had been doing well with no flares since April 2017. Id. She had residual weakness on her right side from a flare in December 2016.[4] Id. She reported getting better, with her right upper extremity recovering more than the lower extremity. Id. She has been walking with a cane. Id. On a review of symptoms, she was negative for psychiatric or behavioral issues. R. at 395. She was alert and attentive without deficit. Id. There was no evidence of motor programming deficit. Id. She had

---

[4] It was noted that her last MRIs in December 2016 showed multiple sclerosis lesions in the brain and cervical cord. R. at 394.

normal muscle bulk and tone. R. at 396. Her strength was 4/5 in her right upper extremity. R. at 396. She was noted to be doing well and stable on her current regimen. R. at 397. She was referred to physical therapy. Id.

On May 2, 2018, she established care with Dr. Kendria E. Holt-Rogers. R. at 391. She was negative for dysphoric mood and sleep disturbance. R. at 391. She was concerned about right leg weakness. Id.

Ms. Morgan returned to Dr. Chen on June 13, 2018. R. at 377. She reported feeling that her condition had stabilized and was not getting better or worse. Id.  She was able to walk with a cane and had not had any falls since her last visit. Id.  She stopped working in February. Id.  She reported attending physical therapy for eight sessions but had not experienced improved mobility. Id.  On a review of symptoms, she was negative for psychiatric or behavioral conditions. Id.  She was alert and attentive without deficit. R. at 379. On a motor exam, she had strength of 4/5 in her right upper extremity (wrist flexion and extension were tested, but  not grip strength). Id.  Dr. Chen noted she was doing well and stable on her current regimen. R. at 380. Ms. Morgan reported her main problem was the weakness of her right leg that she would like to have it better controlled. R. at 378.

On September 6, 2018, she had a Botox injection for right lower leg spasticity. R. at 374. She was noted to be on a nightly muscle relaxer, which had helped a little but she still had a stiff right leg during gait making walking difficult. Id On physical examination, her right arm was preferentially held in flexion at the elbow, wrist, and fingers with spasticity when attempting to extend, though she was able to fully extend her elbow slowly. R. at 374.

On September 28, 2018, Ms. Morgan followed up with Dr. Menachen Nagar at the UMC Neurology Clinic. R. at 485. Ms. Morgan reported compliance with medication and symptom

control. Id.  She had normal attention and concentration during her interview. Id. She had 4/5 strength in her right upper extremity, except for grip strength, which was 3/5. R. at 486. Her hip flexion and knee flexion/extension was 3/5, dorsiflexion and plantar flexion were 4/5. Id. It was noted that she drags her right leg, is unable to flex her knee while walking, and ambulates using a cane. Id.  Medications were continued. R. at 487. Dr. Nagar noted she was doing well and stable on the current regimen. Id.

Ms. Morgan restarted physical therapy on October 24, 2018. R. at 749. She reported that about three years earlier she had begun experiencing functional decline on her right side. Id.  As a result, she began living with her parents, though she reported that she would like to gain more independence so that she could move out. Id.  She had been taking classes to complete the prerequisites to apply to nursing school, but she stopped temporarily due to increased complication with writing, typing, and functional mobility. R. at 750. She also reported that she had to stop driving because of the exacerbation of her symptoms and that she would like to attend driving training/evaluation while in OP therapy. Id.  Her strength and range of motion in the upper extremities were tested. Id. Her forearm and wrist had normal strength and range of motion bilaterally. Id. Her right shoulder had strength of 3 for flexion and abduction and 4/5 or 4-/5 for extension, adduction, internal rotation, and external rotation. Id.  She was evaluated as being able to transfer to and from a bed, chair, tub, car, or toilet independently but with difficulty and using her quad cane. R. at 753. She was assessed as being able to bring food and drink to her mouth, use utensils, bathe and shower, groom, and dress independently but with difficulty. Id.

Over the next few months, her therapy sessions were focused on her right upper extremity with exercises like typing, a clothes pin activity, picking up beans, a lacing activity, and removing pegs from a peg board. R. at 693-746. On October 31, 2018, a gross sensation test of the right arm

and hand was completed and her sensation appeared intact. R. at 746. On November 5, 2018, she average seven words per minute in a typing activity. R. at 744. At the same session during an activity hanging clothespins on a vertical bar, she required frequent rest breaks because her right upper extremity was still fatigued from an upper body ergometer (UBE) exercise. Id. On November 21, 2018, she used her right upper extremity to hang 6 clothespins onto a vertical bar: she required a rest break before taking them back down. R. at 736. In December 2018, she reported that her right hand was getting stronger. R. at 714. A January 23, 2019, progress report noted that she had met her short term goals of completing a 9 hole peg test with her right upper extremity and demonstrating 4-/5 bilateral upper extremity strength. R. at 703. She had partially met her long term goal of demonstrating 4/5-5/5 right upper extremity strength. Id. She had partially met her goal of demonstrating improved accuracy with handwriting and typing speed/accuracy. Id. However, she had not met her long term goal of demonstrating improved grasp/release using all 5 digits to reflect improved digit range of motion. Id.

Meanwhile, she followed up with Dr. Nagar on January 9, 2019. R. at 363. She had normal attention and concentration during the interview. R. at 365. It was noted that she drags her right leg and is unable to flex her knee while walking and that she ambulates using a cane. R. at 366. Strength of right sided biceps and triceps were 4/5. Id. Strength of right interosseous was 3/5. Id. She was noted to have residual right lower leg spasticity. Id. Dr. Nagar noted she was doing well and stable on her current regimen. Id.

Ms. Morgan continued in therapy for her right upper extremity and also began therapy for her right lower extremity in February 2019. R. at 562-689. A February 25, 2019, progress report noted her elbow, forearm, and wrist strength were 5/5 bilaterally. R. at 661-62. It was noted that since beginning therapy, she had demonstrated increased strength, endurance, fine motor control,

and gross motor control in her right upper extremity. R. at 662. On March 25, 2019, she completed Box and Blocks, Nine Hole Peg Test, and Grip strength testing. R. at 624.

A March 27, 2019, Progress Report notes that Ms. Morgan reported no pain. R. at 617. Her right hip strength was measured at 2- to 3+ of 5; her right knee strength was 4+/5 on extension and 1/5 on flexion; her right ankle strength was 3-/5 on dorsiflexion and plantar flexion, 0/5 on inversion, and 1/5 on eversion. R. at 618. She was making steady progress with all functional mobility measures. R. at 620. But it was noted that she remained at high risk and that most recently she had a fall outside of a store front the day before. Id. Increased spasticity, decreased balance, and decreased gait quality and speed were noted. R. at 619.

Ms. Morgan also underwent therapy for her right upper extremity on March 27, 2019. R. at 622. It was noted that she completed a hand controls simulation activity. R. at 622. She did 16 reps of a hand gripper exercise (removing wooden pegs from a board). Id. She completed it with difficulty using her right hand to pick up and manipulate the pegs. Id. She completed a digi-flex exercise with the right hand. Id. She also completed a hand exerciser with the right hand. Id. A Discharge Summary dated April 16, 2019, indicates that she ended therapy for her right upper extremity at that time. R. at 599. It was noted that she had demonstrated an increase in right upper extremity strength and endurance as well as right upper extremity fine motor control and gross motor control as evidenced by increased scores on outcomes measures and performance in the clinic. R. at 600. Strength of her elbow, forearm, and wrist was tested. Id. She demonstrated 5/5 strength and normal range of motion bilaterally. Id.

Ms. Morgan continued physical therapy for her right lower extremity until June 3, 2019. R. at 562-94. The Discharge Summary notes that Ms. Morgan did not want to have to use her cane anymore, but she was scared to let go. R. at 564. She reported no pain and normal sensation. Id.

13

A considerable increase in muscle tone was noted, but passive movement was difficult. Id.  It was noted that Ms. Morgan had shown progress in strength, activity tolerance, and functional mobility as a result of attending physical therapy since January 2019. R. at 567. However, she continued to have difficulty with range of motion and gait. Id. Further spasticity management for her right lower extremity was recommended. Id.

Ms. Morgan followed up with Dr. Nagar on September 2019. R. at 355. Ms. Morgan reported compliance with medication with symptom control and improved walking since her last visit. Id. She had no new complaints. Id.  Her symptoms included righter upper and lower extremity spasticity. Id.  She had 4/5 strength in her right upper extremity, except for grip strength, which was 3/5. R. at 356. Her hip flexion and knee flexion/extension was 3/5, dorsiflexion and plantar flexion were 4/5. Id. She had normal attention and concentration. Id. Dr. Nagar noted she was doing well and stable on her current regimen. R. at 357. She was encouraged to continue home exercise with cycling. Id.

Ms. Morgan had a virtual visit with Dr. Nagar on June 24, 2020, due to the coronavirus. R. at 442. She reported compliance with medication with symptom control and no new symptoms. R. at 442. She had normal attention and concentration. Id. She was noted to be doing well and stable on current regimen. R. at 443. She reported some pain at night sometimes and was instructed to take ibuprofen. Id.

Updated MRIs for multiple sclerosis surveillance were performed on July 29, 2020. R. at 449-56. There was no change from her prior examination in in November 2015 and December 2016. Id.

**Decision of the Administrative Law Judge**

The ALJ found that Ms. Morgan meets the insured status requirements of the Social Security Act through December 31, 2024, and that she has not engaged in substantial gainful activity since the alleged disability onset date of February 6, 2018. The ALJ found that Ms. Morgan has the following severe impairments: obesity, multiple sclerosis, and spine disorders. However, the ALJ found that Ms. Morgan does not have an impairment or combination of impairments that meets or equals the severity of one of the listed impairments.

The ALJ then determined that Ms. Morgan has the residual functional capacity to perform sedentary work with the following additional limitations: she can occasionally and frequently lift/carry ten pounds; she can sit for six hours and stand/walk for two hours out of an eight hour day; she can occasionally climb ramps; she can never climb stairs, ladders, ropes, or scaffolds; with the right lower extremity she can occasionally operate foot controls; she can occasionally balance, stoop, kneel, crouch, crawl, or bend; she should be allowed to use an assistive device such as a cane at will throughout the work day; she is right hand dominant and is able to only frequently handle and finger, reach overhead, and reach in all directions; she must avoid unprotected heights, hazardous machinery, open flames, and open bodies of water; she must avoid the following surfaces: rough, uneven, and vibrating; the job should not require driving or operation of a motor vehicle; and she must avoid concentrated exposure to temperature extremes such as extreme cold. The ALJ concluded that Ms. Morgan is not able to perform any of her past relevant work as a child monitor, cashier checker, or a retail salesclerk. However, considering Ms. Morgan's age, education, work experience, and residual functional capacity, the ALJ found there are jobs that exist in significant numbers in the national economy that Ms. Morgan can perform. Specifically, the ALJ considered the vocational expert's testimony regarding the jobs of addresser, tube

operator, surveillance systems monitor, and call out operator. The ALJ concluded there were 61,100 such jobs in total available nationally.

In assessing the testimony of the vocational expert, the ALJ rejected Ms. Morgan's objection that the vocational expert's methodology for determining the numbers of jobs available was unreliable. In so doing, the ALJ cited the vocational expert's professional knowledge and experience in job placement. The ALJ also noted that the vocational expert's job numbers are from sources of information administratively noticed under the regulations. The ALJ noted further that the vocational expert provided a separate document identifying the publications she used and describing her method. Considering all this, the ALJ found the vocational expert's job information reliable.

Finally, the ALJ concluded that Ms. Morgan has not been under a disability, as defined by the Act, from February 6, 2018, through the date of the decision on September 15, 2021.

## Statement of Issues on Appeal

Issue No. 1.    Did the Commissioner err in relying on the vocational expert's testimony identifying jobs described by Ms. Morgan as obsolete or by relying on jobs that, according to Ms. Morgan, do not exist in significant numbers in the national economy?

Issue No. 2.    Is the Commissioner's residual functional capacity finding supported by substantial evidence?

## Analysis

### I.  Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere

scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    Entitlement to Benefits under the Act.

To be considered disabled under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

(1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

### III.    Plaintiff's Appeal.

*Issue No. 1.    Did the Commissioner err in relying on the vocational expert's testimony identifying jobs described by Ms. Morgan as obsolete or by relying on jobs that, according to Ms. Morgan, do not exist in significant numbers in the national economy?*

Ms. Morgan argues that the ALJ erred in overruling her objections to the vocational expert's methodology and job numbers. She points out that numerous courts, including this one, have held the "addresser" job is obsolete. She argues that the job of "tube operator"—a job that involves receiving and routing messages and items through pneumatic tubes—is also obsolete. She complains that the ALJ failed to acknowledge a Social Security report concluding that the addresser and tube operator jobs may be obsolete. She does not cite any examples of the "surveillance systems monitor" job being found obsolete, but she submits that other courts have held that the surveillance system monitor jobs available do not represent a significant number. She notes further that other vocational experts have testified that there were 19,000 surveillance system

18

monitor jobs in 1994 and 9,200 in 2016. She argues that this calls into question the reliability of the testimony of the vocational expert here that there are now 38,500 such jobs available.

Ms. Morgan further challenges the vocational expert's source of information about the number of jobs available. She argues that neither the OEQ nor Job Pro, which the vocational expert relied on, are on the list of publications entitled to administrative notice—contrary to the ALJ's conclusion. She argues that the vocational expert was unable to identify the methodology used by OEQ to extrapolate job numbers. She points out that the OEQ and Job Pro yielded different numbers of jobs for all of the positions identified by the vocational expert at the hearing. She submits that the vocational expert offered no reasonable explanation for the discrepancy. She argues that this shows the vocational expert's testimony and her sources are unreliable. She points to the vocational expert's testimony that in Texas, they do not accept Job Pro numbers. Ms. Morgan argues that this further calls the reliability of the Job Pro numbers into question.

Ms. Morgan argues further that the ALJ improperly relied on the vocational expert's testimony without resolving contradictions raised on cross-examination and without resolving conflicts. She does not identify these conflicts or contradictions with clarity. However, it appears she is referring to:

(1) The ALJ's identification of jobs that a "Social Security report" identified as jobs that may be obsolete.

(2) The vocational expert's reference to 3,800 surveillance systems monitor jobs although she did not provide a source for this number and although the ALJ ultimately found there were 38,500 such jobs.

(3) The vocational expert's citation to two "radically" different job numbers for each job.

Ms. Morgan complains that the ALJ simply mixed and matched job numbers provided by the vocational expert in her testimony and in response to the interrogatory without any explanation of her choice. She argues that the ALJ merely referenced a final quality review of the numbers without explaining what this review entailed.

In response, the Commissioner argues that once she finds that jobs in the national economy are available, the burden of proof shifts back to the claimant to rebut this finding. She argues that the ALJ may rely on the vocational expert's testimony as long as the record reflects an adequate basis for doing so. The Commissioner submits that the vocational expert here provided a reasonable explanation that the jobs she identified still exist in smaller, but still significant, numbers: she testified that if a job did not exist, then neither the OEQ nor Job Pro would look at it.

The Commissioner argues further that the vocational experts may testify based on their experience or other reliable publications besides the DOT. She argues that the vocational expert did not contradict herself in providing different numbers from different sources. The Commissioner insists that both the OEQ and Job Pro are Social Security accepted publications, citing cases where courts have found these sources acceptable. She argues that in her post hearing document, the vocational expert explained how she arrived at the job numbers.

The Commissioner insists that the ALJ properly addressed Ms. Morgan's objections by explaining that she overruled the objections based on the vocational expert's professional knowledge and experience in job placement. The Commissioner urges the Court to find that the vocational expert's knowledge and experience combined with the use of reliable sources provides substantial evidence for the ALJ's overruling of Ms. Morgan's objections.

The Court finds numerous issues with the vocational expert's testimony and the ALJ's reliance on it. The first problem is the vocational expert's near total inability to explain the basis for her testimony regarding the numbers of jobs available. To be clear, neither OEQ nor Job Browser Pro are explicitly listed in the regulations as entitled to administrative notice. Of course, the regulations contemplate the use of "other publications" that provide "reliable job information." 20 C.F.R. § 404.1566(d). And the Court acknowledges that vocational experts frequently use OEQ and Job Pro and that other courts have recognized them as reliable sources. E.g., Taylor v. Colvin, No. CIV.A. 14-0573, 2015 WL 3603957, at *14 (E.D. La. June 5, 2015) ("[T]he OEQ is an acceptable source of information upon which VE's typically rely."); James v. Colvin, No. CV 16-470-EWD, 2017 WL 4185479, at *10 (M.D. La. Sept. 21, 2017) (finding that the plaintiff had failed to show that the vocational expert's testimony about the types and number of jobs was unreliable because it was based on data from Job Pro where the vocational expert had testified that the Job Pro data comes from the DOT and other resources and that her testimony was consistent with the DOT); Finley v. Colvin, No. CV 14-430-SDD-RLB, 2015 WL 5162476, at *6 (M.D. La. Aug. 12, 2015), report and recommendation adopted, No. CV 14-430-SDD-RLB, 2015 WL 5162396 (M.D. La. Sept. 1, 2015) (finding job numbers were reliable where the vocational expert testified to jobs for each DOT title "using 'Job Browser Pro'" and where the court found the vocational expert did not indicate that he did not know the source of the data he relied on). But not every court has done so. For example, a court in the Middle District of Florida held that "[w]hen a plaintiff challenges the VE's reliance on the software, the Court finds it insufficient to rely on the software solely because the VE states it is normally an acceptable source and used in worker's compensation figures." Hancock v. Comm'r of Soc. Sec., No. 6:15-CV-206-ORL-DNF, 2016 WL 4927642, at *4 (M.D. Fla. Sept. 16, 2016). The court explained further that "[t]he VE's reliance on

SkillTRAN [Job Pro] without any testimony or evidence that she could endorse those numbers based on her knowledge and expertise rendered her testimony unreliable." Id.

Here, similarly to Hancock, the vocational expert did not provide the source of the data she relied on. She also testified that she did not take into consideration the difference between the Census Bureau's definition of full time work as 35 hours per week and the Agency's use of 40 hours per week to define full time work. She adequately explained how she used the percentages of each larger job category associated with the DOT Title sub-category from Job Pro to modify the job numbers that OEQ yielded for the larger job category. Yet she was unable to explain the discrepancy between the number of jobs available in the larger job category in Job Pro as compared to OEQ.

Underlying the critique of the job numbers provided by these sources is the concern that some or all of the listed jobs may be obsolete. Indeed, the 2011 SSA presentation slide deck that Ms. Morgan describes as a "report" lists both addresser and pneumatic tube operator as jobs that "might be obsolete."[5] R. at 171. The vocational expert provided her theory that the job numbers

---

[5] The Dictionary of Occupational Titles was last updated in 1991. Jennings v. Berryhill, No. 17-CV-3062-LTS, 2018 WL 3656306, at *11 n. 5 (N.D. Iowa Aug. 2, 2018). In Cunningham v. Astrue, an unpublished decision out of the Sixth Circuit Court of Appeals, the court remarked that "common sense dictates that when [DOT] descriptions appear obsolete, a more recent source of information should be consulted." Cunningham v. Astrue, 360 F. App'x 606, 615 (6th Cir. 2010); see Hardine v. Comm'r of Soc. Sec., No. 4:19-CV-147-DAS, 2021 WL 1098483, at *1 (N.D. Miss. Feb. 26, 2021) ("Why the vocational experts continue to rely on this particular [obsolete] job rather than so many others provided in the enormous DOT is a puzzle, but the court will not accept it any more than it would accept the job of lamplighter."). As this Court has previously observed, numerous district courts across the United States have found the "addresser" job to be obsolete. Yanke v. Kijakazi, No. 20-CV-1055, 2021 WL 4441188, at *4 (E.D. Wis. Sept. 28, 2021); ); N.B. v. Saul, No. 20-CV-01138-LB, 2021 WL 1947526, at *11 (N.D. Cal. May 14, 2021); Jason Robert F. v. Comm'r, Soc. Sec. Admin., No. 3:20-CV-00201-BR, 2021 WL 1010946, at *8 (D. Or. Mar. 16, 2021); Hardine, 2021 WL 1098483, at *1. The DOT describes the job duties for addresser as "[a]ddresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May sort mail." U.S. Dep't of Labor, Dictionary of Occupational Titles 180 (4th Ed. Rev. 1991). The DOT describes the job duties for tube operator as "[r]eceives and routes messages through pneumatic-tube system: Opens incoming pneumatic-tube carriers containing items, such as mail correspondence, bills, and receipts. Reads and sorts items according to department. Inserts items into carriers, and carriers into tube system, and routes to specified locations." Id. Courts have also rejected as unreasonable vocational expert testimony that a significant number of tube operator jobs exist in the national economy. E.g., Milner v. Kijakazi, No. CV 20-1016 KK, 2022 WL 1125402, at *11 (D.N.M. Apr. 15, 2022); Hawthorne v. Comm'r of Soc. Sec., No. 1:20-CV-02247-FB, 2021 WL 4356009, at *2 (E.D.N.Y. Sept. 24, 2021).

for jobs that may seem to be obsolete have gone down over time, reflecting their reduced prevalence in the economy. But her testimony on this question was couched in speculative terms: "So one would assume that if the job is still listed in the Dictionary of Occupational Titles and Occupational Quarterly, that they exist in the economy," R. at 59, "One would assume that if it was a job that did not exist in the economy, that neither group would look at it," and "So if I have Job Pro numbers, I am –based on what I know about the company and their research—I'm pretty confident that there are some still out there." R. at 57-58. She added that she is "not as confident with the Occupational Quarterly because I don't believe that they do as fine a discovery as they do with Job Browser." R. at 58.

Despite the vocational expert's concerns about the viability of OEQ data about jobs that might be obsolete, the vocational expert used OEQ numbers modified by Job Pro percentages in her testimony to the ALJ and the ALJ adopted these numbers in the decision.[6] Based on the information in the vocational expert's post-hearing submission: For the addresser position, using Job Pro yields 2,699 jobs available nationally while the OEQ numbers modified by the Job Pro percentages yield 12,497; for tube operator, using Job Pro yields 2,952 jobs available nationally while the OEQ numbers modified by the Job Pro percentages yield 7,825; for surveillance system monitor, using Job Pro yields 2,979[7] jobs available nationally, while the OEQ numbers modified by the Job Pro percentages yield 38,562; for call out operator, using Job Pro yields 2,974 jobs available nationally, while the OEQ numbers modified by the Pro percentages yield 6,021. In each case the OEQ method yields at least twice as many jobs available nationally. Using the Job Pro

---

[6] The ALJ adopted the vocational expert's testimony as to the addresser, tube operator, and surveillance system monitor job. The vocational expert did not endorse a number for the call out operator job in her testimony or in the data she supplied following the hearing. The ALJ adopted the Job Pro number of 2,900 rather than the 6,000 jobs yielded using the OEQ number modified by the Job Pro percentages. The ALJ did not explain the basis for this decision.

[7] The vocational expert's written submission states "29," but her testimony as to this number was that there were 2,979 using Job Pro.

numbers for these jobs would yield a total of only 11,604 jobs available nationally.[8] There is no evidence to explain this difference. The vocational expert speculated that OEQ might include jobs that Job Pro does not consider or that Job Pro might look at the numbers more frequently. R. at 54-55. She also testified  that she believes OEQ does not do as fine a discovery as Job Pro. R. at 58. To the extent any of this qualified testimony is credible, it weighs against using the OEQ numbers and in favor of lower Job Pro numbers. As plaintiff points out, the company that makes Job Pro provides a warning on its website that, "[s]ome of these [sedentary, unskilled] occupations may no longer exist at all due to automation, outsourcing, off-shoring, combination with other occupations, or obsolescence." SkillTRAN, Job Numbers, https://skilltran.com/index.php/support-area/documentation/216-job-numbers (last accessed May 11, 2023). The vocational expert here also testified that as to surveillance system monitor—which now only involves monitoring of public transportation terminals—the higher OEQ number was more accurate because of "[t]he fact that these are government positions, and the number of government buildings out there." R. at 62. This appears to be entirely speculative.

Moreover, as Ms. Morgan points out, there are further issues with the number of surveillance system monitor jobs. In a 2016 case, a vocational expert testified there were only 17,000 surveillance system monitor jobs available nationally. Morgan v. Colvin, No. 3:15-CV-2589-L (BH), 2016 WL 5369495, at *10 (N.D. Tex. Sept. 6, 2016), report and recommendation adopted, No. 3:15-CV-2589-L, 2016 WL 5341305 (N.D. Tex. Sept. 23, 2016). In a 1994 case, the vocational expert testified to 18,000 surveillance system monitor jobs. Walker v. Shalala, No. H-93-2507, 1994 WL 171209, at *2 (S.D. Tex. Jan. 6, 1994). And in another 2016 case, the vocational

---

[8] The Court is not convinced this would be sufficient to establish a significant number of jobs in the national economy that Ms. Morgan could perform. The Fifth Circuit has found as few as 50,000 jobs in the national economy that a claimant could perform supports a denial of disability benefits. E.g., Lirley v. Barnhart, 124 F. App'x 283, 284 (5th Cir. 2005).

expert testified to 9,200 surveillance system monitor jobs nationally. Johnson v. Colvin, No. 3:15-CV-1737-N-BK, 2016 WL 1212436, at *3 (N.D. Tex. Feb. 25, 2016), report and recommendation adopted, No. 3:15-CV-01737-N-BK, 2016 WL 1228630 (N.D. Tex. Mar. 28, 2016). In light of these purportedly national numbers and the vocational expert's testimony that the number of surveillance system monitor jobs has reduced over time as jobs formerly in that category have begun to require additional skills, her testimony that there are presently 38,000 such jobs is not credible.

In overruling Ms. Morgan's objections, the ALJ incorrectly stated that the vocational expert's numbers come from sources of information administratively noticed under the regulations. As discussed above, the OEQ and Job Browser Pro are not explicitly included on the list. The ALJ relied on the professional knowledge and experience in job placement of the vocational expert. But the vocational expert herself was unsure about her own numbers and, if anything, her testimony supports using the Job Pro numbers, not the OEQ numbers modified by the Job Pro percentages. Using the Job Pro data yields barely 11,000 jobs in the national economy that Ms. Morgan could perform. The Court can find no basis for holding this to be a significant number. Ms. Morgan's objections to the vocational expert's testimony should have been sustained. The ALJ's determination that there are a significant number of jobs available in the national economy that Ms. Morgan could perform is not supported by substantial evidence. This case should be reversed and the Commissioner should award Ms. Morgan benefits.[9]

---

[9] Whether to remand the case for further proceedings or to award benefits is within the Court's discretion. Bordelon v. Barnhart, 161 F. App'x 348, 352 (5th Cir. 2005). Where further factual development is necessary or where the ALJ must further analyze the existing evidence, remand is appropriate, but where such fact finding or analysis is unnecessary, the Court can direct that benefits be paid. See Davis v. Colvin, 603 F. App'x 257, 258 (5th Cir. 2015); Reed v. Comm'r, Soc. Sec. Admin., No. CIVA 3:08CV0822G(BF), 2009 WL 1574473, at *6 (N.D. Tex. June 4, 2009). No further factual development or analysis of the number of jobs available is necessary here. It is the Commissioner's burden at Step 5 to show that a significant number of jobs exist in the national economy and the Commissioner failed to meet this burden. Moreover, it is clear from the transcript that the vocational expert had already provided all the jobs that might meet the ALJ's requirements.

*Issue No. 2.    Is the Commissioner's residual functional capacity finding supported by substantial evidence?*

Because the Court has determined that an award of benefits is appropriate due to the lack of substantial evidence to support the existence of a significant number of jobs in the national economy that Ms. Morgan could perform, it is not necessary to address the second issue raised by Ms. Morgan.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 9) be GRANTED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 12) be DENIED. The decision of the Commissioner should be reversed, and benefits should be awarded to Ms. Morgan.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 15th day of May, 2023.

Janis van Meerveld
United States Magistrate Judge